Richmond

ROBERT L. NICELY

V.

BANK OF VIRGINIA TRUST COMPANY, TRUSTEE, ETC.

April 24, 1981.

Record No. 790083.

Present: Carrico, C.J., Harrison, Cochran, Poff, Compton and Thompson, JJ.

*A. David Hawkins* (*Overbey, Overbey & Hawkins,* on brief), for appellant.

*Elizabeth M. Allen* (*William H. King; Jr.; McGuire, Woods & Battle,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

This appeal arises in an action at law brought by an employee seeking permanent disability benefits under an employer's profit-sharing plan. During our review, we will examine the rights and liabilities of the parties with respect to administration of the plan.

The employee, appellant Robert L. Nicely, filed a motion for judgment, amended during pretrial proceedings, against Bank of Virginia Trust Company, Trustee of East Coast Oil Corporation Employees' Profit-Sharing Plan and Trust. Nicely seeks recovery of $2,373.27 allegedly due under the Plan because of physical disability that forced him to terminate his employment with East Coast Oil Corporation in 1976.

Alleging the plan qualifies under the federal Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 to 1381, plaintiff sued in the state court. Under ERISA, appropriate state and federal district courts have concurrent jurisdiction of civil actions brought by a participant in such a plan to recover benefits due under the terms of the plan. 29 U.S.C. § 1132(e)(1).

Nicely alleged that as an eligible employee of East Coast he was a Participant in the Plan. Such Plan provided a method of creating and distributing a fund out of the net profits of the company for the exclusive benefit of the Participants and their beneficiaries. He asserted that upon termination of his employment in July of 1976 because of his disability, he became entitled to receive, under the Plan, the full amount that had been credited to his account according to allocations made pursuant to a fixed formula. He alleged his request for payment of the entire sum was denied by the "profit sharing committee." Such denial, plaintiff claimed, constituted a breach of contract by the Plan's Trustee.

Issue was joined upon defendant's denial that plaintiff was entitled to recover the sum sued for, and after the evidence of both parties had been presented to a jury, the trial court sustained defendant's motion to strike the plaintiff's evidence. Eventually, a judgment order was entered in favor of the defendant, and this appeal proceeded.

The facts are undisputed. East Coast established the Plan in 1969 by virtue of a written agreement with the Trustee. Under the terms of

the Plan, which had retirement, disability and death benefits, only the company made contributions to the profit-sharing fund. The Plan provided that "[n]o person shall have any interest in, or right to, any part of the assets of the trust, or any rights under the Plan," except to the extent expressly provided in the Plan.

A Committee, appointed by East Coast's Board of Directors, was responsible for the administration of the Plan. At the time of Nicely's application for disability benefits, there were eight Committee members, all employees of East Coast. The Plan provided that "[a]ll questions relating to the proper construction of any provisions of [the] agreement shall be decided by the Committee, whose decisions in all cases shall be final."

In addition, the Plan provided that in the event of the permanent disability of a participant, the full amount credited to his account as of a specified date preceding the determination of disabilty would be paid to him in such manner as the Committee directed. The term "permanent disability" was defined in the Plan as:

> [T]he permanent and lasting inability, by reason of physical or mental infirmity, or both, as determined by a recognized competent physician acceptable to the Committee, of a Participant to perform the customary duties for which he has been employed.

Nicely, who had worked in East Coast's service stations, formally terminated his employment with the company in August of 1976 at age 40. Shortly thereafter he made application for the full amount of $2,373.27 credited to his account in the profit-sharing Plan. He claimed the sum was due because he became permanently disabled during the previous month from chronic health problems such as "bad nerves," arthritis and heart trouble.

Subsequently, East Coast asked Nicely to submit proof of his disability for consideration by the Committee. He submitted a copy of an October 1976 medical report from his family physician, Dr. W. E. Vermilya of Clifton Forge, as well as copies of two November 1976 letters from the Veterans Administration (VA). The physician summarized Nicely's medical history, concluding, "He has been disabled since July 2, 1976." One of the VA letters notified Nicely that his claim for "Non-service Pension has been granted—effective 5/5/76"; the other stated, "The evidence does establish that you meet the requirements for evaluation of permanent and total disability for non-service-connected pension purposes," and requested current income information so "we can determine your entitlement to VA pension benefits."

Following receipt of this information, the Committee asked Nicely to submit to an examination by a physician selected by East Coast. The employee was examined on December 14, 1976 in Richmond by Dr. John R. Freeman, after East Coast refused Nicely's request that the company pay his travel expenses from his home in Altavista.

In a detailed report to East Coast, Dr. Freeman gave the results of his examination made "in an effort to try to determine total and permanent disability." The physician concluded that additional tests were needed and said more information from the VA was desired. In a January 1977 letter to the company, he asked that Nicely "have a cardiac stress test done to rule out significant coronary artery disease." The doctor said, "I do not have sufficient medical evidence to state that he is or is not totally and permanently disabled."

Thereafter, East Coast arranged for a cardiac stress test to be performed January 17 on Nicely at a Richmond hospital near Dr. Freeman's office. Nicely refused to go to Richmond when the company again declined to pay his travel expenses.

In February of 1977, Dr. Vermilya wrote East Coast about an examination of Nicely made approximately two months earlier "for Disability determination for Social Security." He stated Nicely was to enter a hospital for study of a suspicious chest lesion and, "He will continue to be disabled for an indefinite period."

Subsequently, in a March 1977 letter, East Coast notified Nicely that the Committee "still did not have sufficient information" to determine the extent of his disability. The letter advised that the Committee had decided to approve his application for full benefits provided he qualified "for disability benefits from the Social Security Administration within 6 months of March 15, 1977." The letter also stated, "If you have not been approved for benefits in that time, you will be entitled to 3/15 only."

Nicely did not qualify for Social Security benefits within the time specified. Thereafter, the Committee, without a dissenting vote, refused to pay the employee 100 percent of the amount credited to his account in the Plan. Instead, Nicely was sent a check for $490.41 said to represent a 20 percent vested interest in the account based on his limited length of service with the company; the check was returned to East Coast uncashed.

On appeal, Nicely contends the trial court erred in ruling as a matter of law that defendant had acted properly in denying his application for full benefits. He argues a jury could infer from the evidence that defendant, acting through the Committee, was guilty of bad faith and arbitrary conduct in refusing plaintiff's claim. Further, Nicely

contends there was no factual basis to support the Committee's decision. Defendant disputes each of plaintiff's contentions.

While we have not previously construed similar provisions of such a retirement and profit-sharing plan, there is ample authority from other jurisdictions on the subject. *See generally* Annot., 81 A.L.R.2d 1066; Annot., 42 A.L.R.2d 461; 1A *Corbin on Contracts* § 153 (1963). The better-reasoned decisions proceed on the theory that a noncontributory plan like this is in the nature of a unilateral contract. The company makes an offer to its salaried employees in the form of a promise to pay benefits upon the fulfillment of certain conditions by them or upon the happening of certain events, such as retirement after a specified term of service or sustaining a permanent disability. *Amicone* v. *Kennecott Copper Corp.,* 19 Utah 2d 297, 300, 431 P.2d 130, 132 (1967). Full performance by the employee constitutes acceptance of the offer, and his previously inchoate rights to receive payments under the plan vest and become legally enforceable. *Matthews* v. *Swift and Co.,* 465 F.2d 814, 818 (5th Cir. 1972). *See Rochester Corp.* v. *Rochester,* 450 F.2d 118, 120-21 (4th Cir. 1971). *See also Twohy* v. *Harris,* 194 Va. 69, 81, 72 S.E.2d 329, 336 (1952).

But in establishing the plan, the employer may include certain requirements in the offer with which the employee must comply in order to create an acceptance; the opinion of a competent physician selected by the employer that the employee is permanently disabled is such a requirement. *Amicone* v. *Kennecott Copper Corp., supra.*

Here, the Plan provided the Committee's decision "in all cases shall be final." Under such circumstances, the administrator does not enjoy complete and unbridled discretion. Nevertheless, the courts will not interfere with the administrator's decision denying benefits based upon failure to meet the requirement for such a medical opinion, unless there is clear and convincing evidence against the defendant of bad faith, fraud, mistake, or arbitrary action, thus excusing the employee from fulfilling the requirement. *See Marsh* v. *Greyhound Lines, Inc.,* 488 F.2d 278, 280 (5th Cir. 1974); *Matthews* v. *Swift and Co.,* 465 F.2d at 821.

The ultimate question in the present case, given plaintiff's contentions, is whether any bad faith or arbitrariness has been proved against defendant by clear and convincing evidence. We think it has not, and that the trial court correctly refused to submit the case to the jury.

The Plan required Nicely to prove he had sustained a "permanent disability," defined as "the permanent and lasting inability, by reason

of physical or mental infirmity, or both . . . to perform the customary duties for which he ha[d] been employed." Under the Plan, such a finding could not be furnished by just any medical doctor but must be "determined by a recognized competent physician acceptable to the Committee." None of the information supplied by Nicely met the foregoing criteria. The family physician's October 1976 medical report merely stated Nicely "has been disabled" since July of 1976, giving no hint whether the disability was temporary or permanent. One VA letter only notified plaintiff he had been granted a government pension, without specifying the basis for the award. The other VA notice only advised plaintiff he was qualified for *evaluation* of permanent and total disability for pension purposes. Even assuming that was a finding that Nicely had already been rated as permanently disabled by the VA, the letter did not describe the exact nature of the disability or furnish any basis to determine whether Nicely was unable "to perform the customary duties" for which he was employed by East Coast. In addition, the family physician in February of 1977, when referring to the Social Security examination, was again non-specific about the extent of Nicely's disability: "He will continue to be disabled for an indefinite period."

Lacking definitive proof from plaintiff of permanent disability as defined in the Plan, the Committee quite properly required Nicely to submit to a medical evaluation by a physician that it selected. This was a reasonable and prudent course of action, not only because the Plan specifically provided for it but because the Committee owed a duty to all Participants in the Plan to avoid payment of benefits to unqualified individuals. *See Marsh* v. *Greyhound Lines, Inc.*, 488 F.2d at 283. For example, the Plan provided that when an employee left the company without being disabled, the balance of his account would be redistributed among all other Participants. But the Committe's efforts to make an independent determination whether Nicely was permanently disabled were frustrated by plaintiff's refusal to undergo a necessary diagnostic test requested by the company's physician.

And, as a last resort, the Committee agreed to accept a disability determination of the Social Security Administration, if furnished within a specified time, in lieu of a finding by its own physician. Plaintiff argues this evidences bad faith because the Committee deferred its decision to "another body" that used "an entirely different standard of proof." We do not agree. There is no evidence in the record establishing the Social Security Administration standard to fur-

nish a basis to conclude that such standard was more stringent than the Plan's criteria.

In sum, this record indicates that the Committee considered all the information furnished by plaintiff, that it was not persuaded by his incomplete medical evidence, that it diligently attempted to procure a disability determination of its own which was frustrated by the employee, and that it prudently denied the claim on a sound factual basis after the plaintiff was unable to obtain a favorable ruling from a government source. This is not clear and convincing evidence of bad faith or arbitrariness; rather, it demonstrates reasonable conduct by the Committee and a proper discharge of its administrative duties, about which reasonable minds cannot differ.

For these reasons, the judgment of the trial court will be

*Affirmed.*